JOHN R. HILLSMAN (SBN 71220)
jrh@mhpsf.com
McGuinn, Hillsman & Palefsky
535 Pacific Avenue, Suite 100
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for the Plaintiffs

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNN BROOKS, individually, and as Personal Representative of the Estate of HOWARD WELDON, Deceased, and ANDREW WELDON, <br><br> Plaintiffs, <br><br> vs. <br><br> PADI WORLDWIDE CORP., a California Corporation; PROFESSIONAL ASSOCIATION OF DIVING INSTRUCTORS, a California Corporation; and DIVING SCIENCE & TECHNOLOGY CORP., a California Corporation, <br><br> Defendants. | Case No.  8:19-CV-1314 <br><br> **COMPLAINT FOR WRONGFUL DEATH DAMAGES, SURVIVAL DAMAGES, AND PERSONAL INJURY DAMAGES** |

Plaintiff Lynn Brooks, acting both individually and as the duly appointed Personal Representative of the Estate of Howard Weldon, Deceased, and Plaintiff Andrew Brooks, acting individually, herewith complain against Defendants and for Causes of Action allege as follows:

**PRELIMINARY ALLEGATIONS**
(Parties, Jurisdiction, and Venue)

*Jurisdiction and Venue*

1.      This Court has subject matter over this action pursuant to 28 U.S.C. § 1333(1) in that this is an admiralty and maritime claim within the meaning of Fed.R.Civ.P. 9(h).  As is hereinbelow more fully alleged, the incident and activities which gave rise to this action:

a.      occurred upon actual, navigable waters within the State of Hawaii, in that they took place in Shark's Cove, Oahu, less than one marine league from shore;

b.      had a potentially disruptive impact on maritime commerce, in that they could have precipitated a response from the United States Coast Guard and/or interrupted or diverted vessels operating in or near Shark's Cove from their appointed voyages, and;

c.      had a substantial relationship to traditional maritime activity, in that Defendants and each of them specifically intended, designed, developed, marketed and administered the introductory dive experience known as "the

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

Discover Scuba Diving Experience" ("the DSD Experience") to be conducted from and aboard commercial passenger vessels operating upon navigable waters.

2.    This Court has general, personal jurisdiction over Defendants, and each of them, under  Cal. Code Civ. Pro. § 410.10, and the decisions in *Daimler AG v. Bauman* (2014) 571 U.S. 117 (2014) and *Goodyear Dunlop Tires etc. v. Brown*, 564 U.S. 915 (2011), in that Defendants, and each of them, are domiciled in the State of California.

3.    Venue is properly laid in this Court under 28 U.S.C. § 1391(b)(2) in that Defendants, and each of them, maintain their principal places of business in this judicial district.

*The Plaintiffs*

4.    Plaintiff Lynn Brooks ("Plaintiff Brooks") is the duly appointed Personal Representative of the Estate of Howard Weldon, Deceased and is also said Decedent's "spouse, "as that term is used in 46 U.S.C. §30302, in that, at all times material hereto, she:

a.)    was his unmarried partner;

b.)    was fiscally, physically, emotionally, morally, and socially dependant upon him;

c.)    was held out by Decedent as his wife, and;

d.)    was, and is, the mother of Decedent's natural son, Andrew Weldon.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

At all times material hereto, Plaintiff Brooks was and still is a resident of the State of California.

### Plaintiff and Decedent's Son

5.      Andrew Weldon ("Plaintiff Weldon") was born on February 23, 2000, and is the natural "child" of Plaintiff Lynn Brooks and Decedent Howard Weldon as that term is used in 46 U.S.C. §30302.   At the time of the filing of this Complaint, Plaintiff Weldon was a resident of the State of California.

### The Decedent

6.      Decedent Howard Weldon ("Decedent") was born on January 14, 1957. At all times herein mentioned, Decedent was a "nonseafarer" as that term is used in *Yamaha Motor Corp., USA v. Calhoun,* 516 U.S. 199 (2006).   Decedent was 61 at the time of his death.   Immediately prior to his death, he was an adult resident of the State of California.   He was in good physical and mental health and condition and was the loving and supportive spouse of Plaintiff and the adoring and supportive father of Andrew Weldon.

### The Defendants

7.      At all times herein mentioned, Defendant PADI WORLDWIDE CORP. ("PADI") was and still is a corporation organized and existing under the laws of the State of California and was and still is doing business in California and elsewhere as a recreational scuba diving training and certification agency and the author and publisher of recreational scuba diving manuals, protocols, and procedures.

8.    At all times herein mentioned, Defendant PROFESSIONAL ASSOCIATION OF DIVING INSTRUCTORS  was and still is a corporation organized and existing under the laws of the State of California and was and still is doing business in California and elsewhere as a recreational scuba diving training and certification agency and the author and publisher of recreational scuba diving manuals, protocols, and procedures.

9.    At all times herein mentioned, Defendant DIVING SCIENCE & TECHNOLOGY CORP. was and still is a corporation organized and existing under the laws of the State of California and was and still is doing business in California and elsewhere as a recreational scuba diving training and certification agency and the author and publisher of recreational scuba diving manuals, protocols, and procedures.

10.    The delicts of each Defendant combined and cooperated with the delicts of all the other Defendants so as to cause the subject incident and the resulting damages to Plaintiffs.

11.    Working together, the Defendants, and each of them, have created the world's largest recreational diver training and certification organization.  Together, they have designed, developed, published, administered, and marketed recreational dive-training and dive-touring programs that are conducted by professional PADI members in approximately 175 countries worldwide.  In addition to those dive-training and dive-touring programs, Defendants, and each of them, have worked

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

together to design, develop, publish, administer, and market the DSD Experience. As is hereinabove and hereinbelow more fully alleged, the DSD Experience is a one-time dive protocol for untrained, uncertified persons who are brand new to scuba diving. During the 1980's, PADI and its Co-Defendants recognized that the oceanic resort and cruise markets were lucrative, fast growing, and widespread sources for recreational dive-certification candidates. Defendants, and each of them, designed and developed the DSD Experience during the early 1990's to "tap into" those markets for the purpose of funneling more candidates into PADI's dive-certification programs. From the very start, Defendants, and each of them, thus intended, designed, developed, and marketed the DSD Experience to take place not just from resorts, dive shops, and beaches along the coast, but from commercial passenger vessels operating on navigable waters.

12.    In designing, developing, marketing, implementing, publishing, and administering the DSD Experience, Defendants, and each of them, together with the Surf N' Sea dive shop in Haleiwa, Oahu, that shop's owner, Joe Green, and that shop's dive instructor, Juan "Adrian" Ramirez, acted as one another's agents, alter egos, and/or maritime co-venturers, in that they each:

(a)    agreed to carry on the DSD Experience for profit;

(b)    shared a common purpose and a common intent to be joint venturers;

(c)    shared a community of interest;

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

(d)    made mutual contributions of financing, services, skill, property, knowledge,  or effort to the enterprise;

(e)    exercised some degree of joint control over the venture; and

(f)    agreed to a share both profits and losses.

### THE OPERATIVE FACTS
(The Charging Allegations)

*The DSD Experience as a "Diver Acquisition Tool"*

13.    At all times material hereto, Defendants, and each of them, regarded the DSD Experience as an important source of revenue to PADI, PADI-certified Members, PADI-certified Dive Centers, and PADI-certified Dive Resorts, not only directly through operation of the DSD Experience itself, but also indirectly through the sale of training and certification courses, dive equipment, and dive experiences to DSD Experience participants and their families and friends.  Defendants, and each of them, therefore designed, developed, implemented, and copyrighted the DSD Experience as "a diver acquisition tool."  The protocols and procedures for that copyrighted diver acquisition tool are set forth in "the Discover Scuba Diving Instructor Guide" and "the Discovery Scuba Diving Participant's Pamphlet."  That tool and those protocols and procedures were never meant to be used as part of a dive-training or dive-certification program, but were purportedly designed, adopted, published, implemented, marketed, and administered to:

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

a.    "introduce people to scuba diving in a highly supervised and relaxed manner;"

b.    "dispel common misconceptions about scuba by letting individuals try it for themselves;"

c.    "teach people the basic safety concepts" of scuba diving under the "guidance of a PADI professional," and;

c.    allow non-divers and even non-swimmers "to put on equipment and swim around underwater in a closely supervised environment."

14.    When designing, testing, developing, publishing, marketing, implementing, and administering the copyrighted DSD Experience, Defendants and each of them knew, or in the exercise of even slight care under the circumstances should have known, on the one hand, that:

a.    Close supervision and direct control by a PADI professional over the novices the DSD Experience was designed to entice was essential to the safety of those novices during the open water portion of that Experience, and;

b.    The most critical factor in maintaining such supervision and control was the student-instructor ratio.

On the other hand, Defendants and each of them also knew or, in the exercise of even slight care under the circumstances should have known, that:

a.    The more novices who participated in any particular DSD Experience, the more difficult it would be for the instructor to maintain close supervision

and direct control over those novices; and,

b.      To best use the DSD Experience as a diver acquisition tool, Defendants would have to run as many people as possible through each introductory dive in that the more novices Defendants could entice to participate in any open water experience, the more potential candidates Defendants would acquire for PADI's dive-training and dive-certification courses.

15.     Before the DSD Experience was designed and developed, PADI and its Co-Defendants had designed, tested, implemented, marketed, and administered other introductory scuba diving programs in Hawaii and elsewhere ("pre-existing programs").  The maximum depth of the open-water sites at which PADI members were allowed to conduct introductory dives under the protocols and procedures Defendants established for those pre-existing programs was 30 feet, and the instructor-to-student ratio for those introductory dives was generally two-to-one. The protocols and procedures for those pre-existing programs also required the participants to complete a preliminary safety class and to don scuba equipment, breathe compressed air, and undergo buoyancy-control training in a swimming pool ashore before proceeding to any open water dive site.  In May 1991, however, while PADI and its Co-Defendants were designing and developing the DSD Experience, those Defendants and each of them recognized that such a requirement might interfere with their ability to use the DSD Experience as a diver acquisition tool in the lucrative Hawaiian market because the Hawaiian Islands had relatively few

swimming pools.  Acting with reckless indifference for the safety and health of participants like Decedent Weldon, ignoring the industry-wide Confined Water Training Standards established for Introductory Scuba Experiences by the Recreational Scuba Training Council, and failing to exercise even slight care under the circumstances, PADI decided not only to eliminate any pool-training from the DSD Experience but also to abbreviate the safety schooling and eliminate buoyancy-control training altogether, and instead, to allow complete novices like Decedent Weldon to take their first underwater breath of compressed air at open-water dive sites that were often too deep to stand up in.

16.    As part of the initial design and development process for the DSD Experience, PADI sent a written survey to PADI members who had been conducting introductory dives under the aforesaid pre-existing programs, and requested those PADI members' thoughts and recommendations about the proper participant-to-instructor ratio and maximum depth for introductory dives.  A clear majority of the PADI members who responded to those surveys recommended a participant-to-instructor ratio of no more than two-to-one, and more than 85% of those respondents urged PADI to conduct DSD dives in waters that were 30 feet or less.

17.    Ignoring that consensus, acting with reckless disregard for the safety and health of DSD participants like Decedent Weldon, and failing to exercise even slight care under the circumstances, Defendants and each of them:

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

a.)   Set the initial, participant-instructor ratio for the DSD Experience at six-to-one, and;

b.)   Set the maximum depth for the open-water sites at which DSD dives could be conducted at 40 feet.

.    18.    In the early 1990's, after Defendants had developed and introduced the DSD Experience and published its protocols and procedures, PADI and its Co-Defendants received written complaints about the Experience from several longtime PADI members.  As one of those written complaints admonished: "Please consider changing the ratio to 2:1 (but whatever you do - DO NOT increase the ratio [and] PLEASE-PLEASE-PLEASE-DO NOT change the maximum depth limit of 30 feet." According to another letter, submitted by a prominent PADI member who employed 102 PADI instructors and averaged 55 introductory divers a day: "Past experience has proven that even the most experienced of staff can have difficulty with only four participants even under 'ideal' conditions."

19.    In the mid-1990's, after the DSD Experience had been up and running for a number of years, an uncertified participant suffered a fatal, pulmonary embolism during an open-water, DSD dive off the Hawaiian Islands.  In 1997, another DSD Experience participant got separated from her group during an open-water, introductory dive off the Hawaiian Islands and died by drowning.  The United States Coast Guard's Honolulu Marine Safety Office investigated both deaths and determined that they had occurred because of the subject DSD instructors' failure to

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

provide the victims with adequate supervision. The Coast Guard further determined that the instructions, protocols, and procedures set forth in the Discover Scuba Diving Instructor's Guide and the Discover Scuba Diving Participant's Pamphlet were ambiguous with respect to the meaning of the phrase "direct supervision." The Honolulu Marine Safety Office therefore "strongly" recommended that PADI revise those Manuals and clarify those instructions, protocols, and procedures.

20.    Disregarding the strong recommendation of the U.S. Coast Guard, acting with reckless disregard for the safety and health of DSD participants like Decedent Weldon, and failing to exercise even slight care under the circumstances, PADI lowered the student-teacher ratio from six-to-one to four-to-one but made no other changes to the protocols and procedures set forth in the Discover Scuba Diving Instructor's Guide or the Discover Scuba Diving Participant's Pamphlet. Instead, Defendants, and each of them, continued to provide DSD participants with a perfunctory and "dumbed down" safety presentation, refused to give those participants any buoyancy-control training, continued to conduct the DSD Experience from coastal beaches and commercial passenger vessels without any preliminary pool training, and continued to permit complete novices to put on scuba equipment and take their first breath of compressed air in open waters.

*The Subject Accident*

21.    At all times material hereto, Decedent Weldon, Plaintiff Brooks, and their son Plaintiff Weldon were visitors to the island of Oahu and complete novices

Complaint for Wrongful Death Damages

12

when it came to scuba diving.  On the morning of July 3, 2018, Decedent Weldon, Plaintiff Brooks, and Plaintiff Weldon drove to the Surf N' Sea dive shop in Haleiwa, Oahu.  At all times material hereto, Surf  N' Sea was owned by a PADI professional member named Joe Green.  After reviewing and relying upon the factual representations that PADI and its Co-Defendants had published in the Discover Scuba Diving Participant's Pamphlet and elsewhere about the safe, relaxed, and closely supervised nature of the DSD Experience, Decedent and Plaintiff Weldon agreed to let "Surf N' Sea" take them on such an Experience.

22.    After Decedent and Plaintiff Weldon agreed to purchase the DSD Experience from Joe Green and Surf N' Sea, Juan "Adrian" Ramirez introduced himself as the PADI professional who would guide, direct, and supervise them during their introductory, open-water dive.   At all times material hereto, Ramirez was a dive instructor trained and certified by PADI to supervise, guide, conduct, and direct the DSD Experience in accordance with the protocols, procedures, and instructions that PADI and its Co-Defendants had set forth in the Discover Scuba Diving Instructor Guide and various supplementary training bulletins.

23.    After introducing himself, Ramirez gave Decedent Weldon and Plaintiff Weldon a  perfunctory safety presentation and asked them to complete a 9-question, true-or-false "Discover Scuba Diving Knowledge and Safety Review."  Neither that questionnaire, the advertising published by PADI, the Discover Scuba Diving Participant's Pamphlet, Ramirez's informational presentation, the Discover Scuba

Diving Knowledge and Safety Review, nor anything else Decedent Weldon or Plaintiff Weldon received from Defendants, Ramirez, or Surf N' Sea adequately described the hazards of barotrauma, the risks of breathing compressed air underwater, or the physiological demands of scuba diving.

24.    Rodriguez thereafter grouped Decedent Weldon and Plaintiff Weldon with a third scuba novice named Carl Senning and provided all three of them with fins, masks, scuba tanks, weight belts, and buoyancy compensation devices.  At no time was Decedent required or even allowed to practice using scuba equipment, breathe compressed air, or receive buoyancy-control training either in a swimming pool or in any other relaxed and highly supervised environment.  Instead, he was not given an opportunity to do any of those things until Rodriguez took Decedent, Plaintiff Weldon, and Carl Senning to Shark's Cove off Pupukea, Oahu, the tide-driven, open-water dive site that Ramirez and Surf N' Sea had selected for Decedent's introductory scuba dive.

25.    Although Shark's Cove satisfies the ambiguous criteria PADI and its Co-Defendants had published for open-water dive sites in the Discover Scuba Diving Instructor Guide and the Discover Scuba Diving Participant's Pamphlet, that Cove is not suitable for introductory scuba dives involving untrained novices like Decedent Weldon.  Among other things it is large and unprotected, opens directly onto the Pacific Ocean, is subject to surface waves and submarine currents, has a

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

steep and irregular bathymetry that quickly drops to depths well in excess of 40 feet, and is regularly visited by propeller-driven vessels.

26.    Decedent Weldon, Plaintiff Weldon, Carl Senning, and Adrian Ramirez entered the open waters of Shark's Cove shortly after 11:00 a.m. HST.  While Ramirez purported to oversee and control the activities of all three novices simultaneously, Decedent Weldon was permitted to descend from the surface in water where it was too deep for him to stand with his head above the surface and take his first, underwater breath of compressed air, under circumstances that were neither relaxed nor closely supervised.  Decedent Weldon's son, Plaintiff Weldon, was also in the water, participating in the same DSD Experience, within sight and sound of his father.

27.    Shortly after Decedent took that unsupervised breath of compressed air, he surfaced rapidly, embolized, and began showing signs of distress.  As soon as Decedent reached the surface, he complained that he could not breathe and coughed up a pink, bloody foam.

28.    Ramirez swam over and towed Decedent Weldon back to shore without administering any in-water CPR.  Someone thereafter summoned emergency first responders who arrived at Shark's Cove and tried without success to revive Decedent.  Those first responders thereafter transported Decedent by ambulance to a nearby hospital where he was pronounced dead at 12:41 p.m., HST.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

29.    The autopsy performed on Decedent Weldon concluded, *inter alia,* that he had died from acute respiratory distress.

## FIRST CAUSE OF ACTION
(*For Wrongful Death Damages Caused by Fraud and Gross Negligence*)

30.    Plaintiff hereby incorporates all of the allegations contained in Paragraphs 1-29 hereinabove as though fully set forth herein.

31.    This action arises under the general maritime law of the United States and invokes the remedies handed down in *Moragne v. States Marine Lines*, 398 U.S. 375 (1970), *Sea-Land Services, Inc, v. Gaudet*, 414 U.S. 573 (1974), and *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), as supplemented by *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199 (1996), Haw. Rev. Stats. § 663-3, and *Restatement (2d) of Torts ,*§ 311.

32.    Wantonly using the DSD Experience as a diver acquisition tool, callously hoping to increase their profits, and acting with reckless disregard for the safety and health of participants like Decedent, Defendants and each of them, continuously and repeatedly represented to PADI members and instructors, like Joe Green and Adrian Ramirez, and to consumers and members of the general public, like Decedent and Plaintiff Weldon, that the DSD Experience:

a.    was a perfectly safe way of introducing "people to scuba diving in a highly supervised and relaxed manner;"

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

b.     thoroughly schooled participants in all the "basic safety concepts of scuba diving" and;

c.     allowed non-divers and even non-swimmers non-divers to "put on equipment and swim around underwater in" a safe and "closely supervised environment."

33.     At all times material hereto, and for all the reasons alleged in Paragraphs 13 through 20 hereinabove, Defendants and each of them knew, or in the exercise of even slight care under the circumstances should have known, that those representations were false.     In truth, the DSD Experience was an unsafe and inherently dangerous way of introducing people to scuba diving in that, among other things, it:

a.     did not always introduce divers to scuba diving in a safe, shallow, and relaxed environment;

b.     did not adequately school participants about the hazards of barotrauma, the risks of breathing compressed air underwater, or the physiological demands of scuba diving;

c.     did not provide participants with any buoyancy-control training, and;

d.     did not require a student-to-instructor ratio that guaranteed close or direct supervision.

34.     At all times material hereto, Defendants and each of them knew, or in the exercise of even slight care under the circumstances, should have known that

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

DSD participants like Decedent and Plaintiff Weldon would be placed in physical peril by reason of the hereinabove alleged false representations.

35.    On July 3, 2018, Decedent Weldon and his son, Plaintiff Weldon, acted in reliance on Defendants' hereinabove alleged misrepresentations when they purchased a DSD Experience from Joe Green and Surf N' Sea and took an introductory scuba dive at Shark's Cove under the supervision and direction of Adrian Ramirez.

36.    Decedent was only 61 years old when he embolized and died of acute respiratory failure as a direct, proximate, and legal result of Defendants' hereinabove alleged delicts.

37.    As a direct, proximate, and legal result of Decedent Weldon's death, Plaintiff Brooks and Plaintiff Weldon have suffered the permanent loss of Decedent's financial support, services, guidance, training, instruction, advice, nurture, and example, all to their pecuniary damage in an amount to be proven at the time of trial.

38.    As a further direct, proximate, and legal result of Decedent Weldon's death, Plaintiff Brooks and Plaintiff Weldon have suffered the permanent loss of Decedent Weldon's love, society, affection, and consortium, all to their non-pecuniary damage in an amount to be proven at the time of trial.

39.    As a further direct, proximate, and legal result of Decedent's death, Plaintiff Brooks has incurred funeral expenses in an amount to be proven at the time

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

of trial.

40.    In performing the acts, committing the omissions, and making the misrepresentations alleged herein, Defendants and each of them, were motivated in whole or in part by a desire for financial gain, acted outrageously, and were guilty of fraud, gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable, justifying an award of punitive damages in an amount to be determined at the time of trial herein.

WHEREFORE Plaintiff Brooks requests judgment against Defendants as is hereinafter set forth.

## SECOND CAUSE OF ACTION
(*For Survival Damages Caused by Fraud and Gross Negligence*)

41.    Plaintiff incorporates all of the allegations contained in Paragraphs 1 through 40 hereinabove as though fully set forth herein, save and except the allegation in Paragraph 36 that Plaintiff Brooks and Plaintiff Weldon have suffered the permanent loss of Decedent's financial support.

42.    This action arises under general maritime law and invokes the remedies recognized in *Sutton v. Earles*, 26 F.3d 903 (9th Cir. 1994), *Evich v. Morris*, 819 F.2d 256 (9th Cir. 1987), *Rigsbee v. City & Cty. of Honolulu*, 2019 U.S. Dist. LEXIS 35944 (D.Haw. 2019), as supplemented by *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199 (1996), Haw. Rev. Stats. § 663-7, and *Restatement (2d.) Torts,* § 311.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

43.    As a direct, proximate, and legal result of the hereinabove alleged delicts of Defendants, and each of them, Decedent consciously suffered great physical, mental, and emotional pain and distress before his death, all to his nonpecuniary damage in an amount to be determined at the time of trial herein, and for which Decedent's Estate is entitled to compensation.

44.    As a further direct, proximate, and legal result of the hereinabove alleged breaches of duty by Defendants, and each of them, Decedent incurred a loss of future earnings and income all to his pecuniary damage in an amount to be determined at the time of trial herein, and for which Decedent's Estate is entitled to compensation.

45.    Prior to the fatal injuries Decedent suffered on July 3, 2018, he was 61 years old, and in good health. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendants and each of them, Decedent suffered a hedonic loss of his "enjoyment of life," as that phrase is used in Haw. Rev. Stats. § 663-8.5, *Montalvo v. Lapez*, 884 P.2d 345, 347 n.2 (Haw. 1994), and *Hambrook v. Smith*, 2016 WL 4408991 (D.Haw.) at *40-41, all to his further nonpecuniary damage in an amount to be determined at the time of trial herein, and for which Decedent's Estate is entitled to compensation.

46.    As a final direct, proximate, and legal result of the hereinabove alleged delicts of Defendants and each of them, Decedent incurred ambulance and medical expenses, all to his pecuniary damage in an amount to be determined at the time of

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

trial herein, and for which Decedent's Estate is entitled to compensation.

WHEREFORE, Plaintiff Brooks requests judgment against Defendants as is hereinafter set forth.

### THIRD CAUSE OF ACTION
(*Personal Injury Damages for Emotional Distress Caused by Fraud and Gross Negligence*)

47.     Plaintiffs herewith refer to, and by that reference incorporate each and every allegation contained in Paragraphs 1 through 29 hereinabove as though fully set forth herein.

48.     This Cause of Action arises under general maritime law and invokes the remedy recognized in *Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1009 (5th Cir. 1991), *Nelsen v. Research Corp. of the Univ. of Hawaii*, 805 F.Supp. 837, 849 (D.Haw. 1992), *Fawkner v. Atlantis Submarines, Ltd.*, 135 F.Supp.2d 1127 (D.Haw. 2001), and *Doe Parents No. 1 v. Dep't of Educ.*, 100 Haw. 34 (2002).

49.     At all times material hereto, Plaintiff Weldon was present in the waters of Shark's Cove and witnessed the events described in Paragraphs 26 and 27 as they occurred.

50.     At all times material hereto, Plaintiff Brooks was aware that Decedent and Plaintiff Weldon were scuba diving in Shark's Cove and was waiting for them in the vicinity of Shark's Cove.

51.     As a further direct and proximate result of the aforesaid delicts of the Defendants, and each of them, Plaintiffs Brooks and Plaintiff Weldon have suffered,

and will continue to suffer great mental, emotional, and nervous pain, distress, and

suffering, all to their respective general damage in an amount to be determined at the

time of trial.

WHEREFORE,   Plaintiffs  and  each  of  them,  pray  judgment  against

Defendants and each of them as follows:

Acting as the duly appointed Personal Representative of Decedent's Estate,

Plaintiff Brooks  prays judgment against Defendants, and each of them, for:

1.      Pecuniary damages according to the allegations of Paragraphs 37, 39, 44, and

46;

2.      Non-pecuniary damages according to the allegations of Paragraphs 43

and 45;

3.      Punitive damages according to the allegations of Paragraph 40;

4.      The costs of suit herein;

5.      Prejudgment and post-judgment interest according to law, and;

6.      Such other and further relief as the Court deems just and proper.

Acting individually, and on their own behalf, Plaintiffs, and, each of them,

demand judgment against Defendants, and each of them, or:

1.      General  personal  injury  damages  according  to  the  allegations  of

Paragraph 51;

2.      Punitive damages according to the allegations of Paragraph 40;

3.      The costs of suit herein;

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292

---

Complaint for Wrongful Death Damages

1    4.  Pre-judgment and post-judgment interest according to law, and;

2

3    5.  Such other and further relief as the Court deems just and proper.

4

5 Dated: July 2, 2019

6

7          McGUINN, HILLSMAN & PALEFSKY
           Attorneys for Plaintiffs

8

9        By:  /S/  JOHN R. HILLSMAN

10           JOHN R. HILLSMAN

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292